UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL J. CIESLIK and SMITHA MATHEN, | ) ) ) | |
| Plaintiffs, | ) ) | No. 1:19-CV-05553 |
| v. | ) ) | Judge Edmond E. Chang |
| BOARD OF EDUCTION OF THE CITY OF CHICAGO, | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Daniel Cieslik and Smitha Mathen were teachers at a Chicago public high school that operates in Cook County Jail and teaches detainees there. After Cieslik and Mathen participated in an inspector-general investigation into alleged fraud and improprieties at the school, they were (the Plaintiffs say) targeted for discrimination and retaliation by their employer, the Chicago Board of Education. The Plaintiffs allege discrimination under Title VI, 42 U.SC. § 2000d, *et seq.*, and retaliation under Title VI and Title IX, 28 U.S.C. § 1861, *et seq.* Cieslik brings additional claims for discrimination and retaliation under Title VII, 42 U.S.C. § 2000e, *et seq.* R. 31.[1] The Board has moved to dismiss the First Amended Complaint in its entirety. R. 40.[2] For the reasons explained in this Opinion, the motion is granted in part and denied in part.

---

[1]This Court has federal question jurisdiction under 28 U.S.C. § 1331.

[2]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

## I. Background

For purposes of this opinion, the Court accepts as true the allegations asserted in the First Amended Complaint. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Daniel Cieslik and Smitha Mathen are educators who taught at Consuella York Alternative High School. R. 31, First Am. Compl. ¶ 8. York serves juveniles who are detained at Cook County Jail. *Id.* ¶ 8. Cieslik, a Caucasian man, has taught math at York since around 2014. *Id.* ¶¶ 1, 10. Mathen, a woman of South Asian ancestry, has taught science at York for about 12 years. *Id.* ¶¶ 2, 11.

In Fall 2016, the Board of Education's Office of the Inspector General (which is often referred to as the OIG) launched an investigation into fraud and sexual improprieties at York. First Am. Compl. ¶ 15. During its investigation, the OIG interviewed several teachers, including Cieslik and Mathen. *Id.* ¶¶ 15–16. In September 2017, the OIG issued a report finding that administrators at York, including principal Sharnette Sims, misrepresented the school's academic and operational performance by, among other things, underreporting disciplinary issues, falsely inflating enrollment and attendance data, pressuring teachers into awarding students with unearned credits, and inflating graduation rates. *Id.* ¶ 17; R. 25-2, First Am. Compl., Exh. A, OIG Report. The OIG Report also found that some teachers were discouraged from reporting sexual improprieties committed by their students. First Am. Compl. ¶ 18; OIG Report at 6. This included chronic classroom masturbation and other violations of the Student Code of Conduct against sexual assault and harassment. First Am. Compl. ¶¶ 17–18; OIG Report at 6.

2

Shortly after the OIG Report was issued, the Board removed Sims as York's principal. First Am. Compl. ¶ 20. The Board also launched its own investigation. *Id.* ¶ 23. During the Board's investigation, James Ciesil, Deputy General Counsel for the Board, interviewed Cieslik and Mathen. *Id.* ¶ 24. During the interview, the Plaintiffs confirmed the allegations that they and their colleagues had made to the OIG. *Id.* Ciesil told the Plaintiffs that, due to the sensitive nature of the investigation, the names of interviewee-employees would be redacted from the Board's forthcoming report. *Id.* ¶ 25.

In early November 2017, the Board released the report outlining Ciesil's investigation and recommending that Sims be reinstated as York's principal. First Am. Compl. ¶ 26; R. 25-3, First Am. Compl., Exh. B, CPS Report. Despite Ciesil's promise of redacted names, this Chicago Public Schools (CPS) Report in fact disclosed the Plaintiffs' names. *Id.* ¶¶ 25, 28. The CPS Report also disclosed the race of each of the Plaintiffs and insinuated that their participation in the OIG investigation was racially motivated. *Id.* ¶ 29.

Soon after, still in November 2017, the Board reinstated Sims as principal. First Am. Compl. ¶¶ 22, 36. Sometime after her reinstatement, Sims gave the Plaintiffs negative performance evaluations. *Id.* ¶¶ 40; 44(i); 56; 64. According to the Plaintiffs, the evaluations were biased and failed to comply with the Board's standard evaluation rubric. *Id.* Eventually, the Plaintiffs filed this lawsuit, alleging that the Board discriminated against them based on their race in violation of Title VI. First Am. Compl. ¶¶ 44–49. The Plaintiffs also allege that the Board retaliated against them in

3

violation of Title VI and Title IX. *Id.* ¶¶ 50–68. Cieslik, for now on his own, also alleges race discrimination and retaliation in violation of Title VII. *Id.* ¶¶ 69–86.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (cleaned up).[3] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to focus litigation on the merits of a claim rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir.2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)) (cleaned up).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief can be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the specu-

---

[3]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

lative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

### III. Analysis

### A. Title VI (Federally Funded Programs)

The Board seeks to dismiss the Title VI claims, arguing that the Plaintiffs are not the intended beneficiaries of any federally funded program. R. 40, Def. Mot. Dismiss at 5. Title VI bans certain forms of discrimination in federally funded programs: "no person … shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Although there is no explicit textual basis for a private right of action, the Supreme Court has held that Title VI does authorize an implied right of action. *Alexander v. Sandoval*, 532 U.S. 275, 279–80 (2001). Having said that, a private cause of action can be brought only by the "intended beneficiary" of the financial assistance. *See Simpson v. Reynolds Metals Co.*, 629 F.2d 1226, 1235 (7th Cir. 1980) (explaining that another federal anti-discrimination statute, 29 U.S.C. § 794, is modeled after Title VI and stating that, in Title VI cases, "the plaintiff must be the intended beneficiary of, an applicant for, or a participant in a federally funded program").

In addition to the intended-beneficiary limit on Title VI actions, the implied right of action also cannot be invoked to challenge an *employment* decision of a federally funded entity. The reason for this limit arises from a statutory ban forbidding

the government to take regulatory action under Title VI "with respect to any *employment practice* of any employer, employment agency, or labor organization except where a *primary objective* of the Federal financial assistance is to provide employment." 42 U.S.C. § 2000d-3 (emphases added). Congress enacted this ban on regulation out of "concern that the receipt of any form of financial assistance might render an employer subject to the commands of Title VI rather than Title VII." *Johnson v. Transp. Agency*, 480 U.S. 616, 627 n.6 (1987). Although the statutory ban expressly applies only to regulatory agencies, courts have extended it to the implied private cause of action. *See Reynolds v. Sch. Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1531–32 (10th Cir. 1995) (holding that plaintiff bringing private cause of action under Title VI failed to show that employment was primary objective of defendant's federal funding); *Ass'n Against Discrimination in Emp., Inc. v. City of Bridgeport*, 647 F.2d 256, 276 (2d Cir. 1981) ("[w]e see no indication that Congress would not have intended that the … requirement exist with respect to private actions as well as agency action."). It does make sense to apply the no-employment-practice limit in § 2000d-3 to an implied private right of action: Congress spoke through the statutory text in exempting employment practices from Title VI's regulatory purview, so a judicially implied right of action should incorporate that statutory limitation.[4]

Here, both the intended-beneficiary limit and the no-employment-practice limit operate to require dismissal of the Title VI claim. First, the Plaintiffs fail to

---

[4]One possible exception to the ban on targeting employment practices is if the alleged employment discrimination against non-beneficiaries *causes* discrimination against the *beneficiaries* of the assistance. *See Simpson*, 629 F.2d at 1235 n.16.

allege that employment is the primary objective of federal funding to the Chicago Public Schools or to York. Although the Plaintiffs do allege that the Board received federal funding, First Am. Compl. ¶ 45, they do not allege what the purpose of that funding is. Given the legal nature of the issue, however, its absence from the Complaint is not necessarily a problem. More to the point, in their response brief, the Plaintiffs contend that York received Title I funding to support educational programming for low income, at-risk youth, which includes resources for instruction. R. 48, Pls.' Resp. at 3. The Plaintiffs point to a page on the Illinois State Board of Education website that describes the general purposes of Title I funding. Specifically, Plaintiffs cite a part of the page that says "[Title I] [f]unds *support instruction* in an expanded list of core subjects" and "are used for a variety of expenditures, *including instructional salaries.*" *Id.* at 4 (emphases added).

But those statements only establish that Title I funds are used to support instruction and to pay instructional salaries. It does not suggest that teacher *employment* is the *primary* objective of Title I. Instead, the statutorily defined purpose of Title I is to "provide all children significant opportunity to receive a fair, equitable, and high-quality education, and to close educational achievement gaps." 20 U.S.C. § 6301. Not surprisingly, then, the primary objective of Title I is to educate *students*— providing resources for instruction is only a means (albeit an important one) to that end. *See Veljkovic v. Bd. of Educ. of City of Chicago*, 2020 WL 7626735, at *3 (N.D. Ill. Dec. 22, 2020) (rejecting argument that employment is the primary objective of Title I funding for purposes of Title VI claim). Indeed, the Department of Education,

which administers Title I, has identified the statutory schemes that, in the Department's view, have employment as its primary objective. *See id.*; 34 C.F.R. § 100.3(c)(1)(A)–(D). Title I is not one of them. *See Veljkovic*, 2020 WL 7626735 at *3; 34 C.F.R. § 100.3(c)(1)(A)–(D).

Where (as here) the primary objective of federal assistance is not employment, Title VI can still provide a cause of action against an employment practice if the employment discrimination necessarily causes discrimination against the primary beneficiaries of the aid. *Ahern v. Bd. of Educ. of City of Chicago*, 133 F.3d 975, 978 (7th Cir. 1998). Here, however, the Plaintiffs do not explain how the Board's alleged employment discrimination against them caused discrimination against York students, who are the primary beneficiaries of Title I funding. *See* 20 U.S.C. § 6301 ("The purpose of this subchapter is to provide all children …"). The Plaintiffs' best theory is that by turning a blind eye to the misconduct uncovered by the OIG investigation, this "short-changed York students, who received an education inferior to that of students elsewhere in the system." R. 63, Pl.'s Surreply at 2. But that chain of reasoning does not explain how students would be *discriminated* against on the basis of their race, color, or national origin. Remember that the relevant section of Title VI is a nondiscrimination statute: "Title VI authorizes remedial action if employment practices tend to exclude from participation, deny benefits to, or otherwise subject the primary beneficiaries of a federal program to *discrimination* in violation of 42 U.S.C. § 2000d." *Ahern*, 133 F.3d at 977 (emphasis added). So even if the Board's discounting

of the OIG Report would lead to inferior education outcomes, that would not subject the students to the intentional discrimination banned by Title VI.

The Plaintiffs' final argument on Title VI is to point to the demographic distribution of the York student body across race. *See* First Am. Compl. ¶ 9; Pl.s' Surreply at 1–2. But the private right of action implied by Title VI does *not* cover the disparate-impact form of discrimination—only intentional discrimination. *Alexander*, 532 U.S. at 291–93. The alleged racially disparate impact cannot form the foundation for the Title VI claim. For all these reasons, the Title VI claims (Counts 1 and 2) are dismissed. Given the legal principles that govern these claims, it does not appear that the Plaintiffs can fix the claims to state a claim. But given that the case is just now exiting the pleading stage, for now the dismissal is without prejudice. After the parties propose a discovery schedule, the Court will set a Rule 16(b) deadline to add parties and to amend pleadings. If the Plaintiffs have not successfully sought to amend the Title VI claims by that deadline, then the dismissal will automatically convert to a dismissal with prejudice at that time.

## B. Title IX Retaliation

Next up are the Plaintiffs' Title IX retaliation claims. The Board advances two arguments in support of dismissing those claims: the Plaintiffs failed to state a claim under Title IX; and the claim is preempted by Title VII. Def. Mot. Dismiss at 12.

### 1. Failure to State a Claim

To adequately state a retaliation claim under Title IX, Plaintiffs must allege that (1) they engaged in a statutorily protected activity; (2) the Board took an adverse

action against them; and (3) the Plaintiffs' protected activity was the but-for cause of the retaliatory act. *Burton v. Bd. of Regents of Univ. of Wisc. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017).

On the first requirement, the Plaintiffs sufficiently alleged their participation in a statutorily protected activity. To be "statutorily protected," the activity must have some connection with a protected class, such as race, sex, or national origin. *See Kodl v. Bd. of Educ. Sch. Dist. 45, Villa Park*, 490 F.3d 558, 563 (7th Cir. 2007); *Tomanovich v. City of Indianapolis,* 457 F.3d 656, 663 (7th Cir. 2006) ("[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient."). The Plaintiffs have plausibly alleged that they opposed sex discrimination and harassment of the instructors at York. First. Am. Compl. ¶ 62. According to the Amended Complaint, the Plaintiffs "truthfully reported to the OIG regarding their knowledge of practices and incidents at York." *Id.* ¶ 16. These practices included sexual improprieties like chronic classroom masturbation by students and threats made by an organized faction of students who committed sexual assault in the Jail. *Id.* ¶ 18; OIG Report at 6. The OIG Report found that the Board underreported this dangerous sex-related misconduct. OIG Report at 6. By alleging their participation in the OIG investigation, then, the Plaintiffs adequately alleged their opposition to sexual harassment suffered by their colleagues. First Am. Compl. ¶ 62.

The Plaintiffs also sufficiently alleged a materially adverse action. For a claim of retaliation, an action is materially adverse if it would "dissuade[] a reasonable

10

worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006) (cleaned up); *see also Washington v. Illinois Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005); *Burton,* 851 F.3d at 696. This is a lower bar to clear than what qualifies as a materially adverse action for an employment *discrimination* claim, which requires a "significant change in employment status." *Boss v. Castro,* 816 F.3d 910, 917 (7th Cir. 2016) (cleaned up).

Here, the Plaintiffs suffered two actions that would dissuade a reasonable employee from opposing sexual harassment. First, the Board is alleged to have disclosed the Plaintiffs' identifying information in the CPS Report (contrary to a prior assurance of confidentiality), identified the Plaintiffs by race, and accused the OIG investigation (in which the Plaintiffs participated) of having a "racial" element. First Am. Compl. ¶¶ 25–30, 64. The CPS report also declared that "most of the teachers interviewed by the OIG had been disciplined by Dr. Sims or had engaged in some other action that tends to show bias." *Id.* ¶ 30. That sort of public disclosure and disparagement would make a reasonable person think more than twice about opposing sex discrimination. *See Greengrass v. Int'l Monetary Sys. Ltd.,* 776 F.3d 481, 485 (7th Cir. 2015) (holding that the complainant was subjected to actionable retaliation when former employer disclosed her identity in public filings describing her complaints as meritless).

Second, the Plaintiffs allege that they undeservedly received negative performance evaluations. *Id.* ¶¶ 40, 64. Whether a performance evaluation is a materially adverse retaliatory action is a fact-specific inquiry. *See Burlington N.*, 548 U.S. at 69.

11

In at least one case, the Seventh Circuit explained that a negative performance review could constitute a materially adverse action for purposes of a retaliation claim. *See Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 741 (7th Cir. 2011) (holding that "a negative performance evaluation could constitute an adverse action within the meaning of the direct method of proving retaliation (as distinct from a claim of discrimination based on a prohibited classification)"), *overruled on other grounds by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). Contextual facts such as the overall performance evaluation and prior expectations are important considerations. *See Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009) (holding that the adoption of an improvement plan requiring daily and weekly schedules was not materially adverse); *Brown v. Illinois Dep't of Nat. Res.,* 519 F. App'x 930, 933 (7th Cir. 2013) (holding that a generally satisfactory review with some suggestions for improvement was not materially adverse); *Palermo v. Clinton*, 437 F. App'x 508, 511 (7th Cir. 2011) (explaining that mildly constructive comments contained in otherwise positive review were not materially adverse). But here, at the pleading stage, the Plaintiffs have plausibly alleged that negative performance evaluations were adverse enough to dissuade a reasonable teacher at York from opposing harassment. First. Am. Compl. ¶ 56.

Lastly, the Plaintiffs adequately allege a causal connection between their participation in the OIG investigation and the adverse actions. "In Response to [opposing sex discrimination and harassment], the Board retaliated against Plaintiffs by accusing them of racist motivations, impugning their integrity, defaming their reputations,

and giving false negative performance evaluations that prospectively denied them job opportunities." First. Am. Compl. ¶¶ 62, 64. Given the context and the release of the CPS Reports, nothing more is needed. The Plaintiffs have stated a claim for retaliation under Title IX.

## 2. Preemption

The Board also argues that Title IX does not provide a private cause of action for employment discrimination that is redressable by Title VII's comprehensive statutory scheme. Def. Mot. Dismiss at 12. In this particular case, this argument fails because the Plaintiffs alleged their opposition to sexual harassment in an educational setting, not in the context of an employer-employee relationship.

In *Waid v. Merrill Area Public Schools*, the Seventh Circuit held that Title VII, in light of its comprehensive statutory scheme protecting against employment discrimination, foreclosed employment-based discrimination claims brought under Title IX for equitable relief.[5] *Waid v. Merrill Area Pub. Sch.*, 91 F.3d 857, 862 (7th Cir. 1996), *abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 259 (2009). But *Waid* does not control here. First, in *Waid*, the substitute teacher who brought the case sued the School Board for run-of-the-mill employment discrimination; specifically, the Board refused to hire her as a permanent teacher based on her sex. *Id.* at 860. It is not surprising that the Seventh Circuit held that Title VII's

---

[5]In *Waid*, the plaintiff's request for compensatory and punitive damages under Title IX was not foreclosed by Title VII because her claim arose before the 1991 amendments to Title VII that authorized, for the first time, compensatory and punitive damages for Title VII claims. 91 F.3d at 862.

comprehensive remedial scheme for employment discrimination would preclude a lawsuit under Title IX for relief that could be obtained under Title VII. *Id.* at 862.[6]

In contrast, here the Plaintiffs' Title IX retaliation claims are premised *not* on opposition to employment discrimination; instead, the claims are premised on opposition to student versus teacher harassment. First. Am. Compl. ¶¶ 13, 17–18, 62; OIG Report at 6 (setting forth findings on chronic classroom masturbation and threats made by students who committed sexual assaults in the Jail).[7] At this stage of the case, the Board has not shown that the Title IX retaliation claims map so closely on to a Title VII retaliation claim that the Title IX claims must be precluded. Because the Plaintiffs might be required to prove different (or less demanding) elements to

---

[6]It is worth noting that there is no controlling Seventh Circuit case extending *Waid* to retaliation. In at least two instances, the Seventh Circuit has decided appeals of suits involving both Title VII and Title IX claims for retaliation. *Burton*, 851 F.3d at 695; *Milligan v. Bd. of Trustees of S. Illinois Univ.*, 686 F.3d 378, 387–88 (7th Cir. 2012). But preemption was not at issue in either appeal, so the opinions do not say one thing or another about whether Title VII precludes a Title IX claim based on retaliation.

[7]Although sexual harassment in the educational setting often takes the form of student-on-student or teacher-on-student offenses, courts have found that student-on-teacher harassment is also actionable under Title IX and Title VII. *See Plaza-Torres v. Rey*, 376 F. Supp. 2d 171, 180 (D. Puerto Rico 2005) (holding that student-on-teacher harassment claim would have been actionable under Title IX); *Peries v. New York City Bd. Of Educ.*, 2001 WL 1328921, at *6 (E.D.N.Y. Aug. 6, 2001) (denying summary judgment on teacher's Title VII claim against employer for failing to address student-on-teacher harassment). The defense here cites *Howard v. Board of Education*, 893 F.Supp. 808 (N.D. Ill. 1995), to support the preclusion of Title IX suits for employment-related opposition. In *Howard*, however, the teacher-plaintiff was subjected to sexually offensive comments by both students and *other teachers* in violation of Title VII and Title IX. *Id.* at 812. It is true that *Howard* held that the Title IX claims were preempted by Title VII. *Id.* at 815. But the Title IX claim in *Howard* explicitly sought relief for harassment "which affected a term, condition or privilege of her employment with the Board," *id.* at 812, which is not surprising given the allegation that other teachers engaged in harassment. So in *Howard* the Title IX claim overlapped with Title VII's statutory scheme in a way that the Plaintiffs' Title IX retaliation claims here do not.

prevail on the Title IX retaliation claims than they would under Title VII, the claims survive, at least for now.

### C. Title VII: Race Discrimination

The Board next seeks dismissal of Cieslik's Title VII race discrimination claim, arguing that he failed to plead what the Board believes are the requisite elements. According the Board, to state a claim under Title VII for discrimination, Cieslik must plead that "(1) he is a member of a protected class; (2) he met his employer's legitimate expectations; (3) despite his performance he suffered an adverse employment action; and (4) his employer treated similarly situated employees outside of the protected class more favorably." Def. Mot. Dismiss at 14. The Board contends that Cieslik has missed the last two elements.

The overarching problem with the Board's argument is that the Board demands that Cieslik plead the elements of a *prima facie* case under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). But that framework is a way for employees to survive *summary judgment* motions and does not supplant the straightforward pleading requirements for a Title VII discrimination claim. Instead, at the pleading stage, "the Supreme Court has made clear that the pleading standards in Title VII cases are different from the evidentiary burden a plaintiff must subsequently meet when using the method of indirect proof under *McDonnell Douglas* …." *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1028 (7th Cir. 2013) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)). Under "a

notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a prima facie case because the *McDonnell Douglas* framework does not apply in every employment discrimination case." *Swierkiewicz*, 534 U.S. at 511.

To survive a motion to dismiss a Title VII discrimination claim, a plaintiff need only allege that "the employer instituted a (specified) adverse employment action against the plaintiff on the basis of her [protected class]." *Carlson v. CSX Transp., Inc.,* 758 F.3d 819, 827 (7th Cir. 2014) (cleaned up); *see also EEOC v. Concentra Health Services, Inc.,* 496 F.3d 773, 781–82 (7th Cir. 2007) (stressing the simplicity of pleading a Title VII discrimination claim). "The plaintiff is not required to include allegations—such as the existence of a similarly situated comparator—that would establish a prima facie case of discrimination under the 'indirect' method of proof." *Carlson*, 758 F.3d at 827. So, at the pleading stage, Cieslik need not allege the elements of a *prima facie* case.

What Cieslik must allege, however, is a materially adverse employment action. *See Carlson*, 758 F.3d at 827. For purposes of a discrimination claim, an adverse employment action is, at a minimum, "a quantitative or qualitative change in the terms or conditions of employment." *de la Rama v. Illinois Dep't of Human Servs.,* 541 F.3d 681, 685–86 (7th Cir. 2008) (cleaned up). Put another way, an adverse employment action is "more than a mere inconvenience or an alteration of job responsibilities." *Id.* at 685 (cleaned up). Examples of materially adverse employment actions include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material

16

responsibilities, or other indices that might be unique to a particular situation." *Id.* at 685–86 (cleaned up).

On its own, a negative performance review is typically not a materially adverse action for purposes of a Title VII employment discrimination claim. *See Langenbach v. Wal-Mart Stores, Inc.,* 761 F.3d 792, 799 (7th Cir. 2014); *Boss*, 816 F.3d at 918 (holding that placement on performance improvement plan not materially adverse); *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) (explaining that "unfair reprimands or negative employment actions, unaccompanied by some tangible job consequence, do not constitute adverse employment actions"). Here, Cieslik fails to allege any tangible employment consequence resulting from the negative performance review. He vaguely alleges "loss of job opportunities," but without any concrete factual substance to the assertion, the allegation is more of a conclusion than a fact. First Am. Compl. ¶ 71. Beyond the Amended Complaint, the EEOC Charge attached to the pleading merely alleges detriment to "future job prospects." R. 25-4, First. Am. Compl., Exh. C, EEOC Charge at 7. So the pleadings and the EEOC Charge are devoid of any factual content showing an actual—rather than a mere potential—change in the terms or conditions of Cieslik's employment.

In a similar way, the Board's disclosure of Cieslik's identifying information and disparaging comments about him do not constitute a materially adverse employment action. Cieslik alleges that the CPS Report wrongly accused that (1) he provided false information to OIG; (2) was a disgruntled employee; and (3) his participation in the

17

OIG investigation was racially motivated. First Am. Compl. ¶¶ 70(d)–(f). Cieslik contends that this public disparagement created a "loss of prestige" which, in his view, constitutes an adverse employment action. Pls.' Resp. at 9. In support, he relies on *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), but that case is not on point. In the part of *Ellerth* on which Cieslik relies, the Supreme Court made the unsurprising point that had the plaintiff been denied a promotion (she actually received it), then that would rise to the level of a tangible job consequence. *Burlington*, 524 U.S. at 747–48, 761. Here, Cieslik's allegation of a "loss of prestige," without more, is not on a par with the denial of a promotion.

Cieslik also unsuccessfully relies on *Greengrass v. International Monetary Systems*, 776 F.3d 481 (7th Cir. 2015), for the proposition that public disparagement qualifies as an adverse action for a discrimination claim. Pls.' Resp. at 9–10. *Greengrass* involved a *retaliation* claim, which as explained earlier in this Opinion, merely requires that an adverse action "dissuade a reasonable worker from supporting a charge of discrimination." *Greengrass*, 776 F.3d at 485; *Burlington N.*, 548 U.S at 53. Moreover, the employee in *Greengrass* supplied additional facts that gave rise to the inference that the public disparagement did have a tangible negative impact on her future employment prospects. For one, she actually had left the employer's company and was affirmatively seeking new employment. *Greengrass*, 776 F.3d at 485. A recruiter allegedly informed the now-former employee that she was "unemployable" due to the information contained in the public filings. *Id.*. Here, Cieslik has not alleged anything along those lines, either internally within York or the Chicago Public

18

Schools, or externally with other potential employers. Without any *factual* allegations to the effect that the CPS Report created any tangible employment consequences, he has failed to adequately allege a materially adverse action for purposes of a Title VII discrimination claim. The claim is dismissed. For now, the dismissal is without prejudice because the case is just now moving beyond the pleading stage. Like the Title VI claims, if Cieslik has not successfully sought to amend the Title VII discrimination claim by the Rule 16(b) deadline, then the dismissal will automatically convert to a dismissal with prejudice at that time.

### D. Title VII: Retaliation

As currently drafted, Cieslik's Title VII retaliation claim is premised on his alleged opposition to race discrimination. There are two defects in this claim. First, Cieslik failed to exhaust this claim with the EEOC. Before filing suit under Title VII, an employee must exhaust administrative remedies by filing an EEOC charge (or a charge with the parallel state non-discrimination agency). *Reynolds v. Tangherlini*, 737 F.3d 1093, 1099 (7th Cir. 2013); *Dandy v. United Parcel Serv.*, Inc., 388 F.3d 263, 270 (7th Cir. 2004). The scope of the EEOC Charge limits the scope of the later-filed lawsuit in federal court. *Id.* Here, Cieslik's EEOC Charge complains of retaliation for opposition to *sexual harassment* only. EEOC Charge at 5–8. The EEOC, when receiving this charge, would have no reason to investigate retaliation for opposition to *race* discrimination. Cieslik has failed to exhaust the Title VII retaliation claim, so it must be dismissed on this ground alone.

19

The second problem is that Cieslik fails to allege any causal connection between the retaliatory conduct and his purported opposition to race discrimination. To adequately state a claim for retaliation under Title VII, Cieslik must allege that (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; (3) and there is a causal connection between the two. *Lord v. High Voltage Software, Inc.,* 839 F.3d 556, 563 (7th Cir. 2016). Like with the Title IX retaliation claims, Cieslik did adequately allege an adverse *retaliatory* action (the public disparagement in the CPS Report and negative performance evaluations) and that his participation in the OIG investigation caused the retaliation. What is missing is that the protected activity had anything to do with opposing race discrimination. Remember that the OIG was investigating fraud and sexual misconduct. First Am. Compl. ¶¶ 15, 17–18. Cieslik does not explain how participating in the OIG investigation is equivalent to opposing *race* discrimination.

It is of course true that filing a race discrimination charge with the EEOC is statutorily protected activity in opposition to race discrimination, and Cieslik did indeed allege racial discrimination in his EEOC Charge. *See* EEOC Charge at 1. But the Amended Complaint presents the retaliation claim as premised only on Cieslik's participation in the OIG investigation. First Am. Compl. ¶ 76. Perhaps Cieslik did not invoke the EEOC Charge as the statutorily protected activity because the retaliatory actions happened *before* the Charge's filing. In any event, the current pleadings fail to adequately allege opposition to race discrimination as the basis for the retali-

ation claim. Again, for now the dismissal of this claim is without prejudice, both because exhaustion is a non-merits disposition and because discovery has yet to begin. But if Cieslik does not successfully move to amend this claim by the Rule 16(b) deadline, then the dismissal will convert to a dismissal with prejudice.

## IV. Conclusion

The Board of Education's motion to dismiss is granted in part and denied in part: the Title IX retaliation claims (Count 3) of both Plaintiffs survive; the Title VI discrimination claim (Count 1) and the Title VI retaliation claim (Count 2) are dismissed; and Cieslik's Title VII discrimination claim (Count 4) and Title VII retaliation claim (Count 5) are dismissed. The dismissals are without prejudice for now, but the to-be-set Rule 16(b) deadline will serve as the deadline for fixing them lest they be dismissed with prejudice. In advance of the tracking status hearing of April 9, 2021, the parties shall file a status report, *see* R. 5, by April 6, 2021.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 29, 2021

21